Opinion delivered November 3, 1888.

---

No. 2994.

EX PARTE ROBERT H. RICE.

HABEAS CORPUS—FACT CASE.—See the statement of the case for evidence adduced upon a habeas corpus proceeding for bail—murder being the offense charged—*held* not to amount to "proof evident" of a capital offense; wherefore the ruling of the trial court refusing bail was error.

HABEAS CORPUS on appeal from the District Court of Live Oak.   Tried below before the Hon. D. P. Marr.

The relator in this case was held under an indictment which charged him with the murder of J. W. Wilson, in Live Oak county, Texas, on the thirtieth day of August, 1888. This appeal is prosecuted from the ruling of the trial court refusing bail, and remanding the relator to the custody of the sheriff of Live Oak county. The judgment is reversed, and bail is awarded in the sum of eight thousand dollars.

In stating this evidence the report will follow the order in which it appears in the record, the proof of the State taking precedence of that of the relator.

J. W. New was the first witness introduced by the State. He testified that he lived in Live Oak county, Texas, and knew the relator, whom he pointed out. He also knew the deceased in his life time. The witness went to the town of Oakville, the site of said Live Oak county, on the morning of August 30, 1888. He took his gun with him for the purpose of having it repaired. As soon as he reached town he went to Wimmer's store, taking his gun with him. On the gallery of the said store the witness met the relator, Hatfield and others; and the entire party proceeded to examine the witness's gun, the relator suggesting that the witness would have to get the "needle" drawn from the gun and repaired before the gun could be put in order. The relator had no gun of his own while he and others were on the gallery examining the witness's gun. The witness had his head down and was examining the gun, and did not see the relator when he left the gallery, but, a few minutes after the relator made the remark about the necessity of repairing the "needle" of the gun, the witness heard a shot fired from behind him, and not far from his head. Turning his head he saw the relator standing inside the store door, with a gun in his hands. Just before the shot was fired the witness saw McGrew and a man whom he did not then recognize coming towards the store. Just after the shot was fired, the man with McGrew fell to the ground, and the witness recognized him as J. H. Wilson, the deceased. He was shot through the right side of the head. Witness went into Wimmer's store a few minutes, but then saw nothing of the relator.

On his cross examination the witness said that McGrew and the deceased were about twenty feet distant from Wimmer's gallery when the fatal shot was fired. Deceased approached the store on the right hand side of McGrew. When the witness first saw McGrew and deceased, before the shooting, they were

about the north corner of the fence of the court house square, walking together towards Wimmer's store. At that time the deceased had his hat pulled down over his face. The reputation of the relator was that of a peaceable, quiet, law abiding man. In making this statement the witness spoke from personal knowledge, and not from having heard the relator's said reputation discussed. The witness did not know whether or not the deceased was armed when he was shot and killed. He was a deputy sheriff and usually carried weapons.

E. T. Hatfield testified, for the State, that he was on the gallery of Wimmer's store, in Oakville, Texas, at the time the deceased was killed. He was then examining a gun which had been brought to him by Mr. New to be repaired. The relator was one of the persons who also examined that gun on the said gallery. A few moments before the shooting occurred the witness saw McGrew and the deceased at the north corner of the court house square, approaching the store. About that time the relator stepped away from the place on the gallery where he had been standing, and a few moments later the witness heard the report of a gun fired from a point behind him. Witness then looked into the store door and saw the relator standing there with a gun in his hand. The deceased was about fifteen feet distant from the gallery when the fatal shot was fired. He had on a vest, but no coat. The charge from the gun took effect in the right side of the head of the deceased. At or about the time that the witness observed the approach of McGrew and the deceased, he observed that the relator was standing in the store door. From that point he saw the relator step back into the store. Witness did not see Arthur Wimmer come to the store. He at first thought that the shot was fired as a joke. He was the first to reach the deceased after he fell, and at that time saw no weapon on or about his body. The fatal shot was fired about eight o'clock in the morning. The witness could not now remember all of the several parties who were present at the time of the shooting.

On his cross examination, the witness said that when he first saw McGrew and the deceased at the north corner of the square he recognized McGrew but did not recognize the deceased, who had his hat pulled down over his face. When the witness looked back, just after the shot was fired, the defendant had the gun in his hands, the muzzle pointing upward. When he next observed the relator, a moment or two later, he was hold-

ing the gun with the muzzle pointing downward, and appeared to be trying to throw a shell into the gun, or a shell out of it. The witness did not afterward see the relator, but heard somebody run through the store. The front of Wimmer's store opened by a double door, four feet wide. It was before this door that the witness saw the relator with the gun just after the fatal shot was fired. At this point the witness put on his hat and pulled it down in front to rest on or cover the eye brows so as to illustrate the manner in which the deceased wore his hat when the witness first saw him approaching the store with McGrew. Deceased appeared at the same time to be looking on the ground. Witness merely glanced at him and McGrew as they approached, and did not then recognize the deceased.

John McGrew was the next witness for the State. He testified that he and the deceased left the Oakville house together early on the morning of August 30, 1888, to go to Wimmer's store. They walked slowly around the square, conversing with each other, until they reached a point about ten steps distant from and in front of Wimmer's store, when he saw a man step to the door from the inside of the store, raise a gun and fire. Deceased fell as soon as the shot was fired. The witness did not recognize the man who fired the fatal shot. Deceased had no arms on his person so far as the witness saw or knew.

Cross examined, this witness stated that when he and deceased reached a point about twenty yards distant from the front of the store, the deceased put his hands to his pants as if to pull them up. A person standing in the door of Wimmer's store at the time could have seen that movement of the deceased's hands. A few more steps were taken by witness and deceased before the fatal shot was fired.

On re-direct examination, the witness stated that he and deceased got together about an hour before the killing, and did not separate again until after the fatal shot was fired. The witness did not know on that morning that the relator was in town, and he did not think that deceased knew or suspected that he was in town. The double front door of Wimmer's store opened to the inside, and it was an easy matter for a person concealed behind those doors on the inside to observe the approach of a person on the outside. The witness saw nobody in the store door until the man with the gun stepped into it and fired. He did not see anybody hiding behind that door. The witness did not think that deceased had been on Wimmer's side

of the square on the morning of the shooting prior to his death. When the shot was fired and deceased fell the witness sprang to one side, and a few moments afterwards, went into Wimmer's store. Witness at no time recognized the man who fired the fatal shot. The witness was a friend to both the relator and the deceased.

Steve Rix testified, for the State, that, on the morning of and a few moments before the fatal shooting, he went into Wimmer's store, entering at the back door. He then took a seat on a box near the front of the store, and as he did so observed the relator standing in the store to the right of the door, as the door is entered from the front. He had a shot gun in his hands, the butt of which was resting on the floor. Witness greeted the relator and received a reply which he did not understand. Relator did not then appear to be excited. After about a minute of time the relator raised his gun, stepped to the door opening, and fired. He stood at the door, looking out, for a moment, and then turned and walked rapidly through the store to and through the back door, taking the shot gun with him. On his cross examination, the witness said that he did not see the relator on the gallery at any time. The deceased was a deputy sheriff and generally carried arms.

Arthur Wimmer testified, for the State, that he went to his store between six and seven o'clock on the fatal morning, and on his arrival found E. T. Hatfield and Joseph New on the store gallery, examining a gun. The double front door of the store was open when the witness arrived. As he passed into the store he saw the relator standing inside, to the right of the door, with one hand resting on the counter. Witness remarked to relator as he passed: "Hello, Bob! you here?" The relator made no reply that witness could now remember, and witness passed on to the rear of the store, in which the post office was situated, for the purpose of making up the mail. He could not now say how long he remained in the post office, but in a short time he had occasion to go up stairs for something. Just as he reached the top step of the stairs he heard the report of a gun. He went at once to the back window up stairs and looked out. Seeing Steve Rix in the back yard he asked him what was the matter. Getting no reply from Rix, the witness then went to the front window up stairs and looked out, and saw J. W. Wilson, the deceased, lying on the ground in front of the store. Witness then returned to the back window and saw the relator

going off with a gun in his hands. The witness knew that the relator and the deceased were not on good terms. On his cross examination, the witness said that from where the relator was standing in the store, when witness passed him, he could see the north corner of the court house square, and all of the intervening space.

Joshua Hinton testified, for the State, that he went from his home to town on the fatal morning with some person who was riding a horse. When he got within one hundred and thirty yards of Wimmer's store, he heard the report of a gun. A moment later he saw persons running towards that store from different directions. He then changed his course and went to the said store. He found the deceased lying on the ground about fifteen feet from and in front of the gallery. Three buck shot or slugs had penetrated the right side of his head, one entering at the burr of the ear, another on the side of the forehead, and the third at the cheek bone. Seventeen smaller shot were scattered over the right side of deceased's head. Deceased lived about three-quarters of an hour after witness reached him, but never rallied enough to speak.

T. H. Church testified, for the State, that he witnessed the shooting of the deceased from a point near the corner of Wimmer's store. About the time that he reached that point he saw McGrew and deceased walking together towards Wimmer's store. When they reached a point within three or four steps of the gallery of said store, a shot was fired from the front of the said store, and deceased fell. At the moment the shot was fired, the witness was looking at deceased, and deceased was looking up into the face of McGrew, who was a much taller man than deceased. Deceased was on McGrew's right, and by looking up into McGrew's face as they walked along, he exposed the right side of his head to the front of Wimmer's store; and it was in the right side of his head that the fatal shot took effect. McGrew was looking straight in front, towards the store, just before the shot was fired, and the witness observed that just about the time the gun was discharged, he swerved or stepped away from deceased. Witness went to the deceased after he fell, and spoke to him, but deceased did not reply.

A. Coker testified, for the State, that he was the sheriff of Live Oak county, and that the deceased, at the time of his death and for several years prior thereto, was deputy sheriff. The witness was in Oakville at the time of the killing of de-

ceased. He heard but did not see the fatal shot fired. He paid no attention to the report until he was informed by somebody that a man had been killed at or near Wimmer's store. He went to that store at once and found deceased in a dying condition. He then went in search of relator, but failed to find him. Two or three days later the witness went to Chester's house in Live Oak county. When he got in sight of the house he saw the relator enter that house at the front. Witness went around the house, but when he got to the rear of it he saw the relator about forty yards distant, running through an old field. Relator made good his escape, but voluntarily surrendered to witness on the thirteenth day of the following month, the district court having convened in the meantime, and this indictment presented against him.

Fred Hinton testified that he went into Wimmer's store early on the fatal morning, and saw the relator in the said store. Witness went from the front to the rear of the store, and was there between five and ten minutes when the shot was fired. Immediately after the shot he saw the relator, with a gun in his hands, going towards the back door of the store.

E. E. Templeton testified, for the State, that he was the clerk at the Oakville house, which was situated on the west side of the public square. Deceased put up at the said hotel on the day previous to his death, and slept there that night. The witness was in the hotel on the next morning when deceased and McGrew left it and went off together in the direction of Wimmer's store, which was on the east side of the public square. Deceased and McGrew had not been gone above five minutes when the fatal shot was fired. Deceased's pistol was in the hotel office at the time he was killed. Deceased came to the hotel about noon on the previous day, and remained about town from that time until he was killed on the following morning.

On his cross examination, the witness said that he did not see deceased and McGrew on the fatal morning before the shooting, as he had not got up when they left. From his bed, however, he heard them at the breakfast table; and he heard them when, having finished breakfast, they left the dining room. After the lapse of about the time that it would take a person, walking in an ordinary gait, to reach Wimmer's store from the said hotel, the witness heard the report of a gun, fired at or about Wimmer's store. A few minutes later the witness went to Wimmer's store, and found the deceased lying on the ground. At the

time that the fatal shot was fired, the deceased's race horse,
saddled, was tied to a tree in front of the livery stable, and in
view, the witness thought, of persons on the gallery of Wim-
mer's store. After the killing of deceased, the witness observed
the pistol of the deceased lying on a bed in the hotel—the same
place were the witness saw it on the evening before.

To this testimony the trial judge adds the following note: "I
am not certain whether the witness said the pistol was on the
bed or hanging up in the office of the hotel."

E. Wimmer testified, for the State, that he and his brother
were the proprietors of the store in Oakville in front of which
the killing of the deceased occurred. The post office was kept
in the rear part of that store. The deceased was killed about
eight o'clock on the morning of August 30, 1888. Witness at
that time was in the post office, and did not see the fatal shot
fired. Very soon after the fatal shot was fired, the relator,
with a gun in his hand, passed by the post office, out at the
back door of the store, and out of the yard through the back
gate, which he left open, and which the witness afterwards
closed to prevent the escape of stock he had in the said yard.
The relator came to the store very early on that morning, and
witness handed him a letter through the delivery window. The
witness, who remained in the post office, did not see the re-
lator again until just after the fatal shot was fired. The
relator came to the witness's store about eleven o'clock on the
previous night to get his mail, and remained until about one
o'clock. The witness was at that time asleep on his cot, which
was stretched in front of his store. The approach of a horse-
man aroused him, and presently the relator rode up, dis-
mounted and took a seat on the side of the cot. He had a gun
in his hand, and witness asked him what he was doing with it.
He replied that he was carrying it for self protection; that the
deceased had sent him word that he intended to kill him on
sight; that deceased was an officer, and could carry a pistol,
while he could not, and was compelled, therefore, to carry a
gun. About that time the relator manifested some excite-
ment, and asked: "What is that I hear?" He then walked in
the direction from which some kind of a noise proceeded, but
soon returned, and said: "I do not want to be shot in the
back." He then told witness that deceased might kill him, and
that he wanted to make some disposition of his property in an-
ticipation of such event, and asked witness if he could make a

will.   Witness told him that, according to his understanding, a will, to be legal, would have to be acknowledged before an officer.   Relator then gave witness the address of his sister, and said:  "You have my property, and if I get killed by Wilson I want my sister to have it."   The witness's store had been the relator's headquarters in Oakville for several years.   He generally kept his money on deposit with witness, and got his mail at the post office in the witness's store.   He came to the post office on that night expecting to get an important letter, the acknowledgment of a large draft that the witness had sent off for him a few days before, and to learn whether or not the draft had been paid.   The mail usually reached Oakville about eleven o'clock at night, and it had for some time been the custom of the relator to come for his mail late at night.   The mail hack not having arrived at one o'clock on that night, the witness told the relator that, as the roads were then bad, it was uncertain when the mail would get in, and advised him not to wait for it any longer, but to go home and return in the morning.   The witness himself became uneasy a short time after the relator reached the store on the night before the killing, and proposed going inside of the store.   After getting into the store, the witness told the relator to leave his gun near the door on the inside.   He did so because, keeping his own and the government money in the safe in the rear of the store, he had made it a rule never to admit an armed man to that part of the building after night.   Relator put his gun down by the door, and witness was now unable to say whether he took it with him when he went home, or whether he left it there all night.   The mail hack arrived that night about two o'clock.   The witness knew the general reputation of the relator for peace and quiet, and it is good.   The relator transacted the larger part, if not all, of his business through the witness's firm, and at times had large amounts of money on deposit with witness.   He lived directly east of witness's store.

The State rested.

W. Lawton was the first witness for the relator.   He testified that he was a butcher by trade, and that his meat market was situated on the same street as and near to Wimmer's store, in Oakville.   He was in his market at the time of the killing. Just before the fatal shot was fired he saw the deceased and McGrew walking towards the said store.   He stepped out of his market to speak to deceased about some meat he had en-

gaged on the evening before, and which he was to take that morning. Just as witness got out of his shop he saw the deceased place his right hand on his groin and turn his head, and just at that instant the fatal shot was fired and deceased fell.

Cross examined, the witness said that he had just turned from his meat safe to front his shop door when he caught sight of deceased and McGrew. The report of the gun and the movement of deceased's hand to his groin were about simultaneous. He made the movement, his head turned, the shot was fired, and he dropped. His head was turned from the store when the shot was fired. At this point the witness illustrated the movements of the deceased's hand about the time the shot was fired, by placing his own right hand first on his groin, then on his right pocket, and then on his stomach. He was unable to say whether the movement of the hand as described was an attempt to draw a weapon, or whether it was the effect of the shot. The movement of the hand immediately or instantly preceded the report of the gun. The whole transaction covered such a very brief space of time that witness was disinclined to swear positively that the movement of the hand preceded the shot, but such was his belief.

H. G. Reynolds testified, for the relator, that between two and three o'clock on the day preceding the killing of deceased, he met the deceased on the San Antonio road, about half a mile above Oakville. Deceased was going towards Oakville from the direction of his ranch. Witness and deceased stopped and talked for a short while about various matters, and presently deceased asked the witness what news there was in town. Witness replied: "There is nothing new except that the fall fights have opened." Deceased then asked if witness knew who came in on the mail hack the night before. Witness replied that he did not know. Deceased then asked witness: "Do you know whether Bob Rice is in town?" Witness replied that he did not. Deceased then produced a pistol from a scabbard hanging at the pommel of his saddle, and a red cloth from his bosom with which he proceeded to wipe the moisture from the pistol—the barrel having caught a little of a recent shower—and said to witness: "I had Hatfield to fix this pistol on purpose to break that d—d son of a bitch, Bob Rice, in two with it." Witness remarked to deceased in reply: "You ought not to talk that way, John; Bob might get the best of you." Deceased retorted violently: "You go and tell Bob Rice that when he

meets me to meet me fighting." Witness replied: "No, I don't want to be the bearer of such news." Deceased said again: "You go to Bob Rice and tell him that when he meets me to meet me fighting." Witness then went on to his destination—Lasater's pasture—and thence to Chester's house, which he reached about four o'clock. He met the relator at Chester's house, and told him what the deceased said. Relator said to witness: "I have tried to avoid trouble with that man, but it has come to this: I must kill Wilson, be killed by Wilson, or leave the country." Deceased was a deputy sheriff, usually went armed, and was reputed to be a dangerous man.

T. H. O'Callaghan testified, for the relator, that about eleven o'clock on the day preceding the killing he met the deceased near the jail in Oakville, and in the course of a talk about the divorce suit pending between deceased and his wife the deceased said: "I will kill that d—d son of a bitch Rice, for he is the cause of all my trouble." He referred to the trouble between himself and his wife, the cause of which he charged upon the relator. The witness never communicated that threat to the relator.

Joe Tullos testified, for the relator, that he knew H. G. Reynolds, and was present on the evening before the killing, and heard Reynolds tell the relator that he had just seen the deceased, and that the deceased told him, Reynolds, that he had made Hatfield fix his pistol on "purpose to break that d—d son of a bitch Rice in two with," and that deceased told him, Reynolds, to tell the relator that when he, relator, should meet him, deceased, to meet him fighting. The deceased was a brave and determined man, and a man calculated to execute a serious threat. Witness heard deceased utter threats against the relator some three years before the killing, but never communicated those threats to the relator. He had seen the deceased and relator together since the former uttered the threats last referred to, but never saw the deceased attempt to execute them. Deceased was in the habit of carrying arms, either on his person or on his saddle.

Steve Tullos testified, for the relator, that the first time he heard the deceased utter threats against the relator was some years before the killing, which threats he never communicated to the relator. The last threat uttered by deceased against the relator was made in the presence of the witness on the twenty-

third day of August, 1888, seven days before the killing. That threat, which witness communicated to the relator on the Sunday preceding the fatal Thursday, was in these words, as uttered by the deceased: "If I ever catch Rice at another race track he is my meat." Deceased was regarded in the community as a dangerous man, who would probably execute a threat seriously made. The witness had heard him utter threats which he never executed.

Jack Rix testified, for the relator, that on one occasion, some time before the killing, while he and deceased were standing in front of Wimmer's store, he observed the relator standing near Coker's store. Witness remarked to deceased that "Bob Rice [who had been off with some mules] has got back." Deceased replied: "Yes, that is the d—d half Indian son of a bitch. I will kill him if I get a chance." Witness never repeated that conversation to the relator.

Steve Rix testified, for the relator, that he heard the deceased on two or three different occasions make threats against the life of the relator. The last occasion was in the spring of 1888, when the witness told deceased about finding the body of a mare that belonged to the relator, and which somebody had killed. Deceased said: "Yes, I paunched her, and I want to paunch Rice the same way;" adding that he paunched the mare, thinking Rice would say something about it, and he would then do him the same way. The conversation occurred in Lasater's pasture. Witness never repeated it to the relator.

Charles Boyer testified, for the relator, that the relator got back to Oakville from the mule market on the twenty-second day of August, 1888. He was in the back part of Wimmer's store on the morning of the next day. Deceased entered the store, humming a tune, and afterwards acted strangely. He walked to the back part of the store where the witness and the relator were standing, pulled back his coat and displayed a pistol which was protruding from the waist band of his pants, and glanced at the relator. The relator looked at him, then dropped his head, began toying with his moustache, and appeared to watch the pistol. Deceased then turned to witness, handed him a ten dollar bill, and asked him if he could change it. He then walked into the office, but soon returned, and remarked to the witness: "Keep the bill, and never mind the change. I am owing the house." Meanwhile the relator had left the store. Witness and the deceased then walked to

the front door and joined Jack Rix.  Rix, directing attention to
relator, who was standing in front of Coker's store, said: "Bob
R'ce has got back."  Deceased replied:  "Yes, that is the half
Indian son of a bitch.  I will kill him if I get a chance."  Wit-
ness never communicated that nor any other threat to the re-
lator.  Deceased could have killed the relator in Wimmer's
store on the said occasion if he had tried.

Head Atkins testified, for the relator, that on the twentieth
day of August, 1888, the deceased said to him:  "I will run
Bob Rice a foot race; I will run him a horse race; I will play
him a game of cards; in fact, he is my meat.  I am after him
from this time on."  Witness never communicated that state-
ment to the relator.

T. S. Gilmore testified, for the relator, that he was familiar
with the reputation for peace or violence of both the deceased
and the relator.  The relator was reputed to be a quiet, peace-
able man.  The deceased, on the contrary, was reputed to be a
brave, dangerous man, and a man calculated to execute a
threat.  The witness always made it a point to "get along" with
deceased, and had no hesitancy in saying that he was more
afraid of deceased than of any man he ever knew.  He had
never suffered violence at the hands of deceased, but had sev-
eral disagreements of small moment with him, all of which he
managed to settle amicably.

The relator concluded his case by examining a large number
of witnesses who testified to the reputation respectively of
himself and the deceased as to their characters for peace and
violence.  Those who testified with respect to the reputation of
the relator declared that, during the series of years they had
known him, he had maintained the reputation of a quiet,
peaceable, law abiding citizen.  The remaining large number
of witnesses concurred in declaring that for years past the rep-
utation of the deceased had been that of a dangerous man who
would probably execute a serious threat.  The average estimate
of the witnesses was that he was a peaceable man when not
angry, but was universally regarded as a conspicuously brave
man, a dangerous antagonist, and an habitual bearer of deadly
weapons, which he carried some times in a scabbard about his
waist, some times in his pockets, at other times in the waist-
band of his pants, and frequently on his saddle.  He was an
expert in the use of a pistol; a blusterer and a braggart, but an
exception to that general class in that he was the only man any

of the witnesses had known who was at the same time a "blow" and a brave man who would fight on any provocation.

T. H. Church testified, for the State, in rebutttal, that he was well acquainted with the reputation of the deceased for peace or violence. It was about equally divided. He was generally regarded as a very brave man, who was willing to fight if a fight was wanted, but who, when he found his antagonist unwilling, would not press a fight. Witness saw the shooting of the deceased, and afterwards was the first man to reach his body, and helped to move it to Wimmer's gallery. No arms were found on deceased's body. Deceased made no motion to draw a weapon, at or just before the shooting. He was looking up into McGrew's face when he was shot.

Sheriff Coker testified substantially as did the witness Church respecting the reputation of deceased for peace or violence. Deceased usually carried his pistol on his saddle, but sometimes wore it about his waist. Witness had often seen him about town without arms of any kind on his person. Joshua Hinton testified substantially as did the witnesses Church and Coker regarding the reputation of deceased for peace or violence.

The State closed.

Upon the question of the relator's ability to give bail, two witnesses were examined and stated that the friends of the relator were among the wealthiest and most influential citizens in the county. His own means could be safely estimated at anywhere from fifteen hundred to three thousand dollars. One of the witnesses thought he could make a good bond for five thousand dollars, and the other thought he would find no difficulty in making a good bond for twenty thousand dollars.

*J. D. Morrison* and *Browne & Beasley*, for the relator: The question in this case, as in all cases of its character, is this: From the facts in the record, taken all together, can it be said that "the proof is evident" that appellant was guilty of a "capital offense" in taking the life of deceased John Wilson? Before passing to a consideration of the facts in the case, we wish to call attention to the expression "capital offense," quoted from the State Constitution, article 1, section 11. Does this simply mean murder in the first degree? It should be borne in mind that this degree of murder may be punished by death or by imprisonment for life; but imprisonment for life is not capital punishment. The punishment by death alone is capital punish-

ment. It seems to follow that, unless the murder be of such enormity that death would be the appropriate punishment, it could not fall within the meaning of the expression "capital offense." That, as to murder, this was the meaning the framers of the Constitution intended the expression to have, is made certain by the fact that by the adoption of the Constitution they abolished the alternative punishment of murder in the first degree. It was not until the adoption of the Revised Statutes of 1879 that imprisonment for life was restored as an alternative punishment for the offense.

But take another view of the question. Murder of the second degree is always bailable. The punishment of murder in the second degree runs from five years upward, until it in effect may become imprisonment for life. Thus we have murder of the second degree, committed under circumstances of great enormity, and murder of the first degree, surrounded by mitigating circumstances, punished exactly alike. The former is bailable, should not the latter be also? There is no distinction in the punishment between the class of murders of the second degree and the class of murders of the first degree, just referred to. Clearly, to our minds, there should be none with reference to the question of bail, unless the law is plain that draws a distinction in this respect. Now, if the expression "capital offense" embraces only those cases of murder of the first degree the appropriate punishment of which is death, then appellant is entitled to bail, unless the facts in the record show his offense not only to be murder, but murder of that enormous character the appropriate punishment of which is death. As to the meaning of the expression "the proof is evident," we refer to the following cases in which it has been construed: Ex Parte Foster, 5 Texas Court of Appeals, 625, and Ex Parte Cook, 12 Texas Court of Appeals, 38. It will be found by an inspection of those cases that by the expression is meant that if the proof upon the hearing is of such character that, if a jury were to find a verdict upon it of guilty of a capital offense, the court would approve the verdict, then the case is not bailable—"the proof is evident."

We call attention to the further fact that in the cases referred to, the court, in speaking of a capital offense, seems to have adopted the idea that an offense punished with death is meant by that expression. If the meaning of the expressions "capital offense" and "the proof is evident" be correctly stated by us

above, then the question in this case, as put by us, is too general, and a form more explicit would be: Do the facts in the record in this case, considered all together, lead the legal mind to a satisfactory conclusion that appellant, in taking the life of John Wilson, was guilty of murder in the first degree, and that, if the law be properly administered in the case, he will be capitally punished therefor? We contend that this question must be answered in the negative, and in the argument we will insist: First, that the homicide, with all its attending circumstances, as exhibited in the record, is not murder of the first degree; and, second, that if it be murder of the first degree, it is so mitigated by the surrounding circumstances that it should not be capitally punished and is therefore bailable.

Our first proposition is that the homicide, with all its attending circumstances, as exhibited in the record, is not murder of the first degree. In urging this leading proposition we invoke the attention of the court to the following minor propositions, each of which we will treat separately, and they are:

1. Appellant did not take the life of Wilson upon express malice.

2. At the moment when appellant fired the fatal shot he was induced to believe, and did believe, from the movements and demonstrations then-made by Wilson, taken in connection with his previous threats, threatening gestures and acts, that his life was in immediate danger, and that to slay Wilson was necessary for his self defense.

If either of these minor propositions can be sustained, then the leading proposition is established. Is either supported by the record? We bespeak the indulgence of the court while we endeavor to establish these propositions.

1. Did appellant take the life of Wilson upon express malice?

The meaning of the words "express malice" is clearly stated in the leading case of McCoy v. The State, 25 Texas, 33. The court in that case uses this language: "Express malice is where one with a sedate, deliberate mind and formed design doth kill another;" and again: "Malice, express, consists in the actual, deliberate intention unlawfully to take away the life of another." From these expressions by the court it is apparent that, in order that a killing may be upon express malice, the intention to kill or do some serious bodily injury must be formed, must be decided upon, must exist in the mind before any step

is taken to carry it into execution, and that the mind must be sedate and deliberate when the intention is formed, and also when it is *afterward* executed. The time that elapses between the forming of an intention and its execution is not material, but the act of the mind and the will must be separate, in point of time entirely separate. Now, in the case in hand, unless it clearly and satisfactorily appears that appellant formed the design to take the life of Wilson before any step was taken by him toward the execution of the homicide, and that his mind was then sedate and deliberate, as well as when the homicide was executed, the killing would not be upon express malice.

In the same case of McCoy v. The State, the court has furnished the following rule by which we are to be guided in determining whether any particular homicide was committed upon express malice: "Do the external facts and circumstances at the time of the killing, before or after that time, having connection with it, or relation to it, furnish satisfactory evidence of the existence of a sedate, deliberate mind on the part of the person killing at the time he does the act?" This rule will bring the whole volume of the evidence in appellant's case forward for consideration.

The evidence shows that on the twenty-third day of August, six days before the homicide, Wilson entered the store of E. Wimmer, in the town of Oakville, and approached defendant. His manner was strange; with a threatening gesture he displayed to appellant his pistol, protruding from his pants and partly drawn, and glanced angrily at appellant. That on the same day, Wilson declared that if he caught appellant at another race track he was "his meat," which threat was communicated to appellant three days before the homicide; that on the day before the homicide Wilson declared that he had his pistol repaired to shoot appellant in two with, and sent that as a message to appellant with the further declaration that when appellant "met him again he must meet him fighting," which message was communicated to appellant at about four p. m. on the day before the homicide; that Wilson was reputed to be a man of dangerous character and a man likely to execute a threat; that appellant had the reputation of being a quiet and peaceable citizen; that when appellant received Wilson's message on the evening before the killing, he hung his head a moment and then said: "I have tried to avoid trouble with that man, but it has come to this, that I must kill Wilson, be

killed by him or leave the country;" that appellant on that night
at eleven o'clock, went with a shot gun in his hand to the store
of E. Wimmer, in Oakville, it being his post office, for his mail;
that on hearing a slight noise out in the dark near the store he
imagined that he was about to be shot in the back by Wilson;
that he asked for instructions how to make a will; that he
gave directions to Wimmer, who had his money, to send it to
his sister in case his life was taken by Wilson; that he remained
two hours at the post office awaiting the arrival of the mail,
and finally, at the suggestion of Wimmer, he went home to re-
turn the next morning for his mail; that appellant returned to
the post office on the next morning, early, and received his
mail; that the killing of Wilson occurred about eight o'clock
that morning; that just before the killing appellant was on the
gallery of Wimmer's store and with Hatfield and New, looking
at a gun brought by New to Hatfield for repair; that Wilson
was seen by Hatfield and New from twenty to forty yards
away, walking directly towards the gallery, with his hat pulled
down over his eyes and by this means so disguised that though
they saw him they did not then recognize him; that in view
from the gallery, on the opposite side of the square, Wilson's
race horse, saddled and ready for mounting, stood tied to a
tree, from which direction Wilson came; that about the time
Hatfield and New saw Wilson approaching the gallery, appel-
lant disappeared from the gallery; that he entered the store,
secured his shot gun, stood with it in his hand for a moment,
then stepped forward in front of the door, raised it and fired,
and Wilson fell; that just before the gun was raised and the
shot fired, Wilson, still advancing towards the store, put his
hands to his pants, as though to pull them up; that just before
the shot was fired Wilson put his right hand to his right side in
front; that Wilson was in the habit of carrying a pistol, and
was deputy sheriff; that appellant saw him at Wimmer's store
six days before the killing with a pistol in his pants; that he
was aware of his being a deputy sheriff and of his habit of
wearing a pistol; that appellant, after the homicide, went away
immediately and evaded arrest until the district court of Live
Oak county convened, and then he voluntarily surrendered to
the sheriff.

The foregoing embraces nearly all the material facts in the
case calculated to throw light on the state of appellant's mind
during the criminatory period.

Our first contention is that appellant did not take the life of Wilson after a formed design; and second, that appellant did not form the intention to take his life with a sedate, deliberate mind.

Up to the time Wilson came in sight, just before the killing, it can hardly be insisted that the record shows a formed design in the mind of appellant to take his life. When the threat was communicated to him on the evening preceding the homicide, he stated the situation in which he was placed, but he gave no intimation as to the course he would pursue. When he went to the post office on that night and his reason for carrying the shot gun was demanded by Wimmer, he answered: "I am carrying it for my protection; John Wilson has sent me word that he will kill me on sight, and he is an officer and can carry a pistol, and I can not, and I have to carry a gun." In this answer appellant leaves nothing to intendment or inference. He states directly that he is carrying the gun for his protection, and he proceeds to state the danger against which he has taken this measure of defense. There is not the shadow of a threat in it against the life of Wilson—not even an expression of dislike or ill will towards him. It states this, and only this, that appellant had armed himself with such a weapon as the law allowed him, as a citizen, to carry to protect his life against an impending attack threatened by John Wilson.

The fact that he was armed and at the post office that night and again on the next morning, can have no special bearing or damaging effect against appellant, because this conduct is fully explained by the testimony. E. Wimmer states that appellant was in the habit of coming for his mail late at night, and that at that time he was expecting an important letter in reply to one he had sent off containing a large check; that on account of the bad roads the mail was late that night, and witness advised appellant not to wait for it, but to go home and return the next morning for his mail. The impending, recent threat against his life by a man of dangerous character justified appellant in carrying the shot gun as a measure of protection. It may be admitted that there was little probability of appellant meeting Wilson at the post office at eleven o'clock at night; still, the possibility of such a meeting warranted the precautionary measure.

Take all the conversation that occurred between Wimmer and appellant at the store on the night before the homicide,

other than the question and answer above referred to, and subject it to the most critical examination, and all that can be found in it is a most serious apprehension in the mind of appellant of impending and imminent danger to his own life, cau-ed by Wilson's threat, and a purpose on his part to protect himself, if he can, against the threatened danger. No part of it can be tortured into a threat made by appellant against Wilson, or even into an insinuation that he means to attack him; that appellant should remain at the store of Wimmer on the morning of the homicide, after he obtained his mail, is not a thing unnatural, because Wimmer testifies that he had kept appellant's money for several years, and that appellant was in the habit of making his store his headquarters when in town. There is a fact just here worthy of note, that, though some time must have elapsed after appellant obtained his mail and before the homicide, and there were all the while men in or about the store, no word, act or deed of appellant is shown to indicate that he knew Wilson was in town or was then anticipating a meeting with him.

We have now treated of the "facts and circumstances having relation to the killing and transpiring before it occurred," and we submit that thus far there is to be found no satisfactory proof of a formed design in the mind of appellant to take the life of Wilson.

The facts directly connected with the homicide are very few. Appellant is standing on the gallery of the store, in company with New and Hatfield, looking at a gun which New has brought to Hatfield to repair, and appellant is suggesting necessary repairs on the gun. Just now Wilson, in company with one McGrew, is coming around the north corner of the square, from twenty to forty yards distant, and is advancing toward the gallery. Appellant leaves the gallery, enters the store, secures his shot gun, and, holding the barrel in his hand, rests the gun on the floor, Wilson in the meantime advancing. Wilson puts his hands to his pants, appellant steps to the front of the door, Wilson throws his right hand upon and to the front of his right side, then turns his head to the left, and appellant fires. Wilson was shot from fifteen to twenty feet from the gallery. From the time appellant left the gallery until the shot was fired Wilson walked from fifteen to thirty-five yards. This is a short space, and the time necessary for it to be traversed by a man in a walk, is exceedingly brief. We think it would

be unsafe, and perhaps, without a precedent, to hold, that, in so short a time, a man could quit the peaceful contemplation of an affair of his neighbor, discuss and decide the awful question of unlawfully taking a human life, and afterward put the decision into execution. But in our opinion it is far from satisfactory that appellant formed the intention to take the life of Wilson before Wilson made the movements referred to with his hands, and in that case the act of killing must have accompanied the formation of the intention; in other words, the killing was upon a sudden impulse, and not after a formed design.

Turning now from the position that it does not appear from the evidence that appellant took the life of Wilson after a formed design, our next contention is that appellant did not form the intention to take the life of Wilson, and he did not take the life of Wilson, with a sedate, deliberate mind. The declaration made by appellant when the threat was communicated to him on the evening preceding the homicide, shows that his mind was then powerfully wrought upon, and, in his view, his situation was desperate in the extreme; and his inquiry, made of Wimmer on the night previous to the killing, as to how to make a will, and his direction to him to send his money to his sister, in case his life should be taken by Wilson, evidence an excited and inflamed condition of mind.

To show that the mind of appellant was not cool and deliberate at the time of the killing, but was agitated and excited by passion, rendering it incapable of cool reflection, we think is clearly done by a consideration of the facts and circumstances in this case. Our understanding of the rule is that not only the facts immediately surrounding the homicide are considered in determining the existence of adequate cause for passion, but all the circumstances in the case are to be taken together. The rule we refer to is clearly stated in the case of Howard v. The State in 23 Texas Court of Appeals, 280, and is as follows: "While it is true that the provocation must arise at the time of the commission of the offense, and the passion must not be the result of a former provocation, yet, in passing on the sufficiency of the provocation, and on the effect of the passion upon the mind of the defendant, the past conduct of the deceased towards the defendant, his threats and bearing, in fact all the facts and circumstances, should be considered."

Now, let us recur to the immediate killing: Appellant is standing on the gallery of Wimmer's store, engaged in conver-

·sation with other gentlemen; he sees Wilson coming around the north corner of the square; across the square, and in the ·direction from which Wilson has come, stands Wilson's race ·horse, saddled and tied to a tree; Wilson has his hat pulled ·down over his eyes, is approaching appellant in a sort of dis·guise so complete that his acquaintances, on a casual observation, do not recognize him; he is from twenty to forty steps ·distant and coming straight to appellant. A week before, at this very store, with a bantering gesture, he flaunted his pistol .in appellant's face; the day before he sent a special messenger ·to appellant instructed to say to appellant that he had Hatfield ·to repair his pistol on purpose to shoot him in two, and when he met him again to meet him fighting; this message was delivered at four p. m. on the proceeding day, just fourteen hours before. In our humble judgment, if these were all the facts ·we would be secure in our position, and to state them is to put ·the argument the strongest possible. Under such circum·stances how could appellant be cool and deliberate? How could any man? So long as there is infirmity in human nature —or virtue, we had almost said—such a combination of circum·stances must arouse the passions, and so excite the mind as to render it incapable of cool reflection. But·there are other facts ·in the record, and one of them is connected immediately with ·the homicide. As Wilson ·approaches the gallery he makes a movement with his hands, which appellant might well construe ·into an effort to draw a pistol. We are free to confess this last fact is not proved with clearness; it is not clear that the move·ment made was such a one as was reasonably calculated to in··duce appellant to believe Wilson was about to execute his threat. But that there was some movement of the kind made by Wilson there is not much room to doubt. The appellant saw this· movement, whatever it was, and it would be fair to him ·to allow that it had its effect upon his mind along with other ·facts and circumstances in the case in arousing his passions.

The court need not be reminded that every fact and circum·stance in the case is to be viewed from appellant's standpoint.

The question is, how did things appear to him—not what were the facts. So, judging and taking all these facts and cir·cumstances together, we insist that at the time of the homicide ·there existed probable cause to excite such a passion in the ·mind of appellant as to render it incapable of cool reflection,

or, at any rate, that the proof in this case is not satisfactory that such cause did not exist.

We now proceed to our second minor proposition, which is as follows:

At the moment when appellant fired the fatal shot he was induced to believe and did believe from the movements and demonstrations then made by Wilson, taken in connection with his previous threats, threatening gestures and acts, that his life was in immediate danger, and that to slay Wilson was necessary for his self defense.

Behold appellant, a peaceable and quiet citizen, where his business has called him, and being approached by a violent and dangerous man, who a week before, at that very place, flaunted a pistol in his face, apparently for the purpose of provoking some movement by which he might have an excuse to slay him; whose mouth has long been full of threats against appellant's life, and who, the very evening before, had sent him, at his home, the message that he had his pistol repaired for his destruction, and that when he met him again to meet him fighting. Open war is declared, and there is no chance to escape the fight; the black flag is raised, no quarter will be given and none is asked! This dreadful threat, delivered only fourteen hours before, is still ringing in the ears of appellant. The man who is approaching is not only a violent and dangerous man, but he will execute his threats; he is expert in the use of arms, and carries his pistol about him. Behold him, as he approaches, his hat pulled down over his face! yonder stands his race horse, in his rear, ready for mounting! a movement of his hand to his body is made, where he usually carries his pistol! We submit, that viewed from the standpoint of appellant, there is but one conclusion, and that is: act, or die.

The presentation above made is not exaggerated—it is the evidence, accurately given. As stated before, the movement of the hand might be omitted, and still there is enough in the record to make a case of homicide in self defense, or at least to leave the mind in the greatest doubt upon the question.

We will now present the rules of law which this court has laid down, that in our judgment are applicable to the case as made.

In the case of Penland v. The State, 19 Texas Ct. App., 365, this court states the rule of law in its strict form as follows: "Homicide is permitted by law when inflicted for the purpose

of preventing murder, but the killing must take place while the person killed was in the act of committing the offense or after some act done by him showing evidently an intent to commit such an offense." In this same case at page 377, this court, referring to the rule of law above stated, uses this language: "The rule has been justly enlarged so as to embrace cases of reasonable apprehension of death or serious bodily injury, whether the danger was real or apparent; but such reasonable apprehension and appearances must be such as to spring from and arise out of the acts and conduct of the deceased at the time of the killing." And on page 378, in the same case, this court, still on the same subject, uses the following language: "The belief that a person designs to kill me will not prevent my killing him from being murder, unless he is making some attempt to execute his design, or at least is in an apparent situation to do so and thereby induces me reasonably to think that he intends to do it immediately."

In Marnoch v. The State, 7 Texas Ct. App., 275, this court, having then under consideration the above rule, quotes with approval from the the case of Campbell v. The People, 16 Illinois, 16, the following language: "Men, when threatened with danger, must determine from appearances and the actual state of things around them, as to the necessity of resorting to self defense, and if they act from reasonable and honest convictions, they will not be held responsible, criminally, for a mistake in the extent of the actual danger, when other judicious men would have been alike mistaken."

Referring again to the Penland case, this court, still having under consideration the said rule, quotes with approval from the case of Bohannon v. The Commonwealth, 8 Bushnell, 481, being a Kentucky case, the following language:

"When one's life has been repeatedly threatened by such an enemy (a desperate and lawless man), where an actual attempt has been made to assassinate, and when, after all this, his family has been informed by his assailant that he is to be killed on sight, we hold that he may lawfully arm himself to resist the threatened attack; he may leave his home for the transaction of his legitimate business, or for any lawful or proper purpose, and if, on such an occasion, he casually meets his enemy, having reason to believe him armed and ready to execute his murderous intention; and he does believe, and from the threats, the previous assault, the character of the man and the circumstances

attending the meeting, he has a right to believe the presence of his adversary puts his life in imminent peril, and that he can secure his personal safety in no other way than to kill him, he is not obliged to wait until he is actually assailed."

The illustration from the Kentucky case presents with a fullness that is striking the salient features of the case at bar. As in the former, so in this, the accused is a peaceful, quiet citizen; he has, in effect, been assaulted; his life has been threatened, the deadly message has been sent to him at his home, and of the awful import that he will be killed on sight. His assailant is a dangerous, determined man; he is expert in the use of fire arms and usually carries a pistol. The accused arms himself to resist the threatened attack; he leaves home to attend to his legitimate business, and he casually meets his enemy. It is unnecessary for us to run the parallel further; the court remembers the facts. But we wish to emphasize one fact—it is this: That appellant had the right to believe, and did believe, that the presence of Wilson put his life in imminent peril. and that he could secure his personal safety in no other way than to kill him. The court will bear in mind that in all the record in this case there is not the slightest evidence of any hatred, ill will or dislike on the part of appellant towards Wilson, and that his only motive, therefore, for the killing that can be fairly conceived is that it was to secure his personal safety.

To dwell longer on this issue would not, perhaps, be useful to the court, and we will only add that we are not called upon in this case to show an absolute right of self defense, but it will be sufficient for our purpose if the question is, by the evidence, left involved in any sort of doubt.

We respectfully ask the court, in considering this case, to bear in mind that the threat against which appellant armed himself, and which led to the homicide, was communicated to appellant at four p. m. of one day, and that the homicide occurred at eight a. m. of the following day; that appellant lived three miles from Oakville, the county seat of Live Oak county; and that, while it is the duty of every good citizen to apply to the law for his protection, and not rely on his own arm, yet, in this case, it is not clear that appellant had an opportunity between the time the threat was communicated and the killing, to apply to a justice of the peace to have Wilson put under a peace bond. The evidence shows that Mr. Hinton, who was justice of the peace at the time in Oakville, had just finished

his breakfast, and was on his way up to town when the killing occurred. We do not contend that appellant had such an idea as to resort to the law for protection, but we insist that he should not be held responsible for his failure in this respect in the absence of proof that an opportunity was fairly within his reach to do so.

Our last position is that, should the court hold that the facts in this case show a killing without justification or extenuation, and upon express malice—a killing that is murder in the first degree—then, the circumstances surrounding it so mitigate it that the due administration of the law does not require, and would not admit, capital punishment in the case; and, therefore, appellant is entitled to bail.

The facts supporting this position need not be restated here by us. We have already, to the best of our ability, discussed them in connection with other issues, and the court will at once perceive how, in our view, they support this last position. Our view of the law, as bearing upon this position, we stated in the opening of this argument, and nothing now remains but to submit the position for the consideration of the court.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. As presented in the record, the proof is not evident, in our opinion, that the applicant is guilty of a capital offense, and we therefore award him bail in the sum of eight thousand dollars. Upon his executing and delivering to the sheriff of Live Oak county a bail bond in said sum of eight thousand dollars, in the form and conditioned as the law requires, with sufficient sureties, said bond to be approved by said sheriff, the said sheriff will release the applicant from custody.

*Ordered accordingly.*